UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at PIKEVILLE

CIVIL ACTION NO. 7:08-cv-144-KSF

FREDDIE WATTS                                                                                                PLAINTIFF

vs.                                            **OPINION AND ORDER**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY                                                      DEFENDANT

\* \* \* \* \* \* \* \*

This matter is before the Court on Plaintiff's Motion for Summary Judgment to reverse the decision of the Commissioner denying benefits [DE 6] and Defendant's Motion for Summary Judgment to affirm that decision [DE 7]. For the reasons set forth below, this Court grants summary judgment in favor of the Commissioner.

**I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

On September 23, 2003, Plaintiff applied for a period of disability insurance benefits and Supplemental Security Income (SSI) payments [Tr. 89-91, 449-451]. His applications were denied initially and again after reconsideration [Tr. 73-6, 79-81, 453-6, 458-461]. An administrative law judge (ALJ) denied Plaintiff's claim on October 20, 2005 [Tr. 53-61]. On August 4, 2006, the Appeals Council remanded the case to the ALJ after granting Plaintiff's request for review [Tr. 462-465]. The ALJ again denied Plaintiff's claim on January 11, 2007, and the Appeals Council denied the request for review [Tr. 23-34, 13-16]. Plaintiff now appeals to this court.

Plaintiff's birth date is March 17, 1959, and he is now 50 years of age [Tr. 174]. He has an eighth grade education and worked full time for 18-20 years as a coal miner [Tr. 174, 179]. He claims disability based on a back impairment, hearing loss, emphysema, arthritis and borderline intellectual functioning. [DE 6-2, p. 2]. The ALJ found that Plaintiff had the following severe impairments: "estimated borderline intellectual functioning; neck pain secondary to osteoarthritis

at C4-C5, C5-C6, and C6-C7; depression, not otherwise specified; anxiety, not otherwise specified; chronic obstructive pulmonary disease secondary to continued nicotine abuse; chronic left shoulder pain secondary to acromioclavicular joint arthritis; mild coronary artery disease; and mild loss of hearing." [Tr. 29, Finding 3]. The ALJ found, however, that "the claimant does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." [Tr. 30, Finding 4].

Plaintiff states the issues in this case are whether he meets or equals Listing 12.05, mental retardation; or Listing 3.02, chronic pulmonary insufficiency; or whether the Appeals Council's Order was complied with on remand [DE 6-2, p. 7]. Regarding Listing 12.05, Plaintiff emphasizes his psychological evaluation by Michelle Amburgey in 2003, which resulted in a verbal IQ score of 58, performance score of 56 and a full scale IQ score of 64 [Tr. 229]. He was examined again in June 2005 by Stuart Cooke and obtained a verbal IQ score of 53. Cooke noted that Mr. Watts was having trouble seeing, which precluded giving any other tests. Malingering was ruled out [Tr. 422]. On September 26, 2006, Plaintiff underwent a consultive evaluation conducted by Greg Lynch. Plaintiff's verbal IQ was 66, performance IQ score was 64, and full scale IQ score was 62. This evaluator noted that "he put forth poor effort" and would not follow directions. The evaluator judged the results "to be an underestimate of his true cognitive abilities." [Tr. 518]. Other results were "suggestive of malingering." [Tr. 519].

The Commissioner responded that Plaintiff failed to satisfy his burden of proving through medical evidence that he meets the criteria of the listings in issue [DE 7]. With respect to Listing 12.05C, the Commissioner says Plaintiff was required to show **both** that he had "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested" before age 22 **and** a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* at 6. First, the Commissioner claims that Plaintiff failed to present evidence to meet

2

the diagnostic description in the introductory paragraph of Listing 12.05. Second, the Commissioner argues there was no evidence of IQ scores before age 22 or other evidence of deficits in adaptive functioning necessary to satisfy the description. Third, the Commissioner states there is no record of a "valid" IQ score of 70 or below.

With respect to Listing 3.02, the Commissioner argues that plaintiff failed to present evidence that he complied with the specific documentation requirements for pulmonary function testing. Additionally, the Commissioner noted that Plaintiff continued to smoke against medical advice. [DE 7, pp. 9-11].

Regarding compliance with the Order of the Appeals Council, the Commissioner claims that the ALJ's failure to complete a Psychiatric Review Technique form (PRT) was harmless error in light of the narrative analysis of Plaintiff's mental condition. [DE 7, pp. 12-13]. The Commissioner further argues that Dr. Lewis was not required to address Listing 12.05C and that his medical source statement satisfies the Order of the Appeals Council. [DE 13-15].

## II.     ANALYSIS

### A.     Standard of Review

"Disability" is defined as "the inability to engage in 'substantial gainful activity,' because of a medically determinable physical or mental impairment of at least one year's expected duration." *Cruse v. Commissioner of Social Security,* 502 F.3d 532, 539 (6th Cir. 2007); 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant has a compensable disability under the Social Security Act, the Commissioner must follow a five-step "sequential evaluation process." 20 C.F.R. § 404.1520(a)-(e); *Walters v. Commissioner of Social Security*, 127 F.3d 525, 529 (6th Cir. 1997). Those five steps were summarized in *Walters* as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found disabled.

> 3. If the claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.
>
> 4. If the claimant's impairment does not prevent him from doing past relevant work, he is not disabled.
>
> 5. Even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Id.* "[D]uring the first four steps, the claimant has the burden of proof; this burden shifts to the Commissioner only at Step Five." *Id.*

Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence and whether the proper legal standards were followed. 42 U.S.C. § 405(g); *Longworth v. Commissioner Social Security Admin.*, 402 F.3d 591, 595 (6th Cir. 2005). "Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (6th Cir. 1994). Courts are not to conduct a *de novo* review, resolve conflicts in the evidence, or make credibility determinations. *Id.* "Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *Her v. Commissioner of Social Security*, 203 F.3d 388, 389-90 (6th Cir. 1999). The court must review the record as a whole and take into account whatever in the record fairly detracts from its weight. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### B  Plaintiff's Claims Regarding Listings 12.05C and 3.02

#### 1. Listing 12.05C, Mental Retardation

As noted above, the burden rests with the claimant to prove that his impairment meets or equals a listed impairment. *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2002). The Sixth Circuit

4

and District Courts in Kentucky have considered and rejected several claims of mental retardation that are similar to Watts' claim under Listing 12.05C.

In *Foster*, the evidence from one doctor showed a verbal IQ of 70, performance IQ of 71, and full scale IQ of 69, with some question as to whether Foster was making a good faith effort during testing. A second doctor reported a verbal IQ of 71, performance IQ of 70, and full scale IQ of 68, with the comment that Foster was very cooperative with the examination. Foster completed the ninth grade in special education classes and was unable to earn her GED, despite four attempts. Foster argued that this evidence, combined with her severe mood disorder, were equivalent to Listing 12.05. The court rejected her claim on several grounds. First, it held that a claimant must present "medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Id.* at 355, quoting *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990). "[R]ecent amendments to the regulations further clarify that a claimant will meet the listing for mental retardation only '[i]f [the claimant's] impairment satisfies the diagnostic description in the introductory paragraph *and* any one of the four sets of criteria....'" *Id.* at 354, quoting 20 C.F.R. Pt. 404, Subpt P, App. 1 § 12.00(A) *as amended by* 65 Fed. Reg. 50746, 50776 (August 21, 2000). Foster failed to present evidence that her general intellectual functioning was "significantly subaverage" before age 22. Her first testing was at age 42. She further failed to show "deficits in adaptive functioning" before age 22. Her work at a bank and as a liquor store clerk prior to a leg injury demonstrated her "ability to perform relatively complicated tasks." *Id.* at 355. Accordingly, the court held that her failure to provide evidence to satisfy the "diagnostic description" provided substantial evidence to support the ALJ's conclusion. *Id.*

*West v. Commissioner, Social Security Administration*, 240 Fed. Appx. 692 (6th Cir. 2007) involved a claimant with a seventh-grade education, a verbal IQ of 67, performance IQ of 72, and full-scale IQ of 66. *Id.* at 694. West worked full time doing maintenance and construction work for the City of Wilmore until thyroid problems caused him to cut back to driving a garbage truck two

5

eight-hour days each week.  *Id.*  His hypothyroidism improved at times but was difficult to control. His disability application was denied based on evidence that he did not suffer from disabling weakness and fatigue.  *Id.* at *4.  West also claimed that he met or equaled Listing 12.05C.  The court held that three showings are required under 12.05C:  "(1) he experiences 'significantly subaverage general intellectual functioning with deficits in adaptive functioning [that] initially manifested during the developmental period' (i.e., the diagnostic description); (2) he has a 'valid verbal, performance, or full scale IQ of 60 through 70'; and (3) he suffers from 'a physical or other mental impairment imposing an additional and significant work-related limitation of function."  *Id.* at *5.  West failed to produce an IQ score obtained prior to age 22 or evidence of deficiencies in adaptive functioning arising before age 22.  To the contrary, he was able to function outside of a highly supportive living arrangement; he held a long-term, full time work position, demonstrating an ability to interact socially on a daily basis; he drove a vehicle, cared for his daily needs, paid bills, shopped for groceries, and interacted with friends and family.  *Id.*  Two psychologists did not diagnose West with any form of mental retardation, and one of the evaluations "revealed only borderline intellectual functioning and adjustment disorder."  *Id.*  Accordingly, the Sixth Circuit affirmed that Listing 12.05C was not met.

In *Carmack v. Barnhart*, 147 Fed. Appx. 557 (6th Cir. 2005), the claimant presented evidence that she had an IQ of 70, reads at an eighth-grade level, and performs arithmetic at a fifth-grade level.  One doctor opined that the scores were valid estimates of her abilities and she was "in the borderline range of intellect."  *Id.* at 559.  The state psychologist concluded she has "borderline to low-average intelligence," had limited but adequate ability to concentrate and could adapt to moderate levels of stress.  *Id.*  She obtained her GED, was never enrolled in remedial classes, and performed a variety of jobs including a court reporter and owning and operating a tanning salon.  *Id.*  None of the professionals examining her described her as mentally retarded. *Id.*  The court upheld the ALJ's finding that she was not disabled due to mental retardation.  First,

6

none of her testing was contemporaneous with her developmental period. *Id.* at 560. Second, none of the doctors examining her concluded that she was mentally retarded at any point in her life. Third, her work history belied a claim of mental retardation. *Id.*

*Daniels v. Commissioner of Social Security*, 70 Fed. Appx. 868 (6th Cir. 2003) involved a claimant with a verbal IQ of 75, performance IQ of 67, and full scale IQ of 71, placing her in the "borderline range of intelligence." *Id.* at 869. Daniels worked part-time at a movie theater as a ticket taker and concessionaire and also completed reports that tracked revenue and ticket receipts. *Id.* A second doctor concluded that she had "borderline intellectual functioning" and that her test scores were likely artificially lowered by her depression. *Id.* Her claim for benefits was denied, but the Appeals Council said the record did not clearly establish whether she met the requirements for Listing 12.05C. *Id.* at 870. On remand, a third doctor opined that Daniels' performance IQ of 67 appeared lower than appropriate in light of her clinical functioning and that she retained a limited but satisfactory mental ability to work. *Id.* The record showed that Daniels graduated from high school and earned a cosmetology license. *Id.* at 873. In affirming the denial of her claim of mental retardation, the Sixth Circuit noted that none of the psychologists concluded Daniels suffered from "significantly subaverage general intellectual function" or "deficits in adaptive functioning." *Id.* at 872. The court further noted that Daniels did not provide any evidence her mental deficiency initially manifested before age 22. It said claimants generally must meet this requirement with definite evidence "such as providing the Commissioner with scores from a test taken prior to the age of 22 or conclusions from an evaluation performed before Plaintiff had turned 22...." *Id.* at 873. Finally, the court noted that "medical findings in the evidence must be supported by medically acceptable clinical and laboratory diagnostic techniques." *Id.* at 874, quoting 20 C.F.R. § 404.1526(a). There were no medical findings of "significantly subaverage general intellectual function" or "deficits in adaptive functioning" prior to age 22. Accordingly, the decision in favor of the Commissioner was affirmed.

In *Alcorn v. Astrue*, 2008 WL 1790192 (E.D. Ky. 2008), the plaintiff left school in the ninth grade after attending special education classes. A consultative examination resulted in a verbal IQ score of 68, performance IQ Score of 83, and full scale IQ score of 73, placing Alcorn in the "borderline intellectual functioning" range of intelligence. His past relevant work was as a janitor in a factory. He also suffered from chronic low back pain and left knee pain. *Id.* at *1. The court noted repeated clarifications by the Sixth Circuit that Listing 12.05C requires medical evidence of "the specific factors of paragraph C as well as the diagnostic description in the introductory paragraph." *Id.* at *4. The consultative psychologist opined that Alcorn had a "fair" mental ability to sustain concentration and persistence, interact in an appropriate way socially and respond to pressures found in a day-to-day work setting. *Id. at *5.* The doctor did not find marked deficiencies in adaptive functioning. Alcorn had worked gainfully in the past, helped take care of his disabled father, attended to his own personal needs, was able to drive and help with household chores, and the like. *Id.* Accordingly, the court affirmed the decision that Alcorn was not disabled.

In the present case, Watts' IQ scores were lower than some of the above claimants, but two psychologists found evidence of Watts' malingering. Amburgey noted that Plaintiff "tended to minimize his abilities to a great extent during this assessment." [Tr. 227]. She also said: "Though he likely has limitations, he intently appeared to distort his potential." [Tr. 299]. Dr. Lynch said Watts "put forth poor effort" and the results were "an underestimate of his true cognitive abilities." [Tr. 518]. He concluded Watts' "estimated intellectual functioning would fall somewhere within the borderline to low average range." *Id.* Other test results were "suggestive of malingering." [TR. 519]. Dr. Lewis noted that the record was significant for symptoms of exaggeration and malingering [Tr. 601]. Thus, there is substantial evidence that the scores between 60 and 70 are not "valid" scores. Cooke also ruled out mild mental retardation [Tr. 422].

As in *Foster, West, Carmack,* and *Daniels*, there was no evidence in the present case that Watts' general intellectual functioning was "significantly subaverage" prior to age 22. His grades

in school were not good in most years, but that could be attributable to any number of factors. In fact, he received all "B's" in the 1966-67 school year [Tr. 170]. Like the other claimants, including *Alcorn*, Watts failed to show any "deficits in adaptive functioning" before age 22. Instead, the evidence showed that he held a full-time job as a coal miner for many years and even earned a certification to use dynamite to shoot coal [Tr. 566]. None of the doctors diagnosed Watts with any form of mental retardation. Accordingly, Watts has failed to meet his burden to show his impairment meets or equals a listed disability. The decision in favor of the Commissioner on this ground is affirmed.

2. <u>Listing 3.02, Chronic Pulmonary Insufficiency</u>

Regarding chronic obstructive pulmonary disease, the ALJ said in his October 20, 2005 Decision:

> Mountain Comprehensive Health Corporation chart for 03/24/05 finds Mr. Watts complaining of being short of breath, adding he has black lung. But he continues to smoke against medical advice. He denied chest pain or palpitations. Diagnosis: mild bronchitis second to smoking. On 03/11/05 he complained of severe chest pain and was transferred to Central Baptist Hospital as above. He appeared very unkempt and dirty. On 11/18/04 he complained of left shoulder pain with acromioclavicular joint arthritis. Despite counseling, "Patient does not want to quit smoking [one half pack per day]." On 04/22/04, "It is surprising that patient can buy cigarettes but is not willing to buy his medication." His girlfriend was with him. Spirogram showed moderate obstruction; CT scan was negative. Forced vital capacity was 2.86 liters, forced expiratory volume in one second 1.91 liters; 61% and 50% respectively. On 02/16/05 DLCO (diffusion capacity of carbon monoxide, single breath) was 17.2 (range less than 10.5). On 10/12/04 forced expiratory volume in one second was 1.33 or 35% predicted, on 02/16/05 it was 1.54 or 40% predicted.
>
> Dr. Bobby Kidd's attempted pulmonary function study aborted because of the claimant's submaximal effort. Dr. George Caudill administered a pulmonary function study on 09/25/03; it too failed secondary to the claimant's lack of effort (forced expiratory volume in one second less than 1%).

[Tr. 58]. In the January 11, 2007 Decision, the ALJ addressed this issue as follows:

> He has chronic obstructive pulmonary disease. A Pulmonary Function Study showed moderate obstruction (Exhibits 11F). There is no evidence of any ongoing treatment or deterioration.

[Tr. 31].

9

Plaintiff argues that the standard for Listing 3.02 for chronic obstructive pulmonary disease (COPD) for persons of Mr. Watts' height is an FEV1[1] score equal to or less than 1.55 and that he "achieved these results on two or more pulmonary functioning tests (TR 365, 367, 370)." [DE 6, p. 8]. Accordingly, he claims he is disabled under Listing 3.02.

A threshold flaw with Plaintiff's position is that he is looking at an FEV1 score for a person with a height of 70 inches. The three tests he relies on, however, show Mr. Watts' height at 69 inches [Tr. 365, 367, 370]. The FEV1 score for a person 69 inches tall is 1.45. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 3.02. Plaintiff cites a total of six tests and FEV1 scores in his brief. [DE 6, pp. 2-3]. Of these six, only one score is equal to or below 1.45. That one test on October 12, 2004 reflects a score of 1.33, but notes "fair patient effort and cooperation." [Tr. 370]. Subsequent tests on December 2, 2004, February 16, 2005 and August 4, 2005 show scores of 1.55, 1.54 and 1.80 respectively [Tr. 367, 365, 447].

Mr. Watts' testing for black lung by Dr. Baker on January 8, 2004 reflects a score of 2.31, yet the technician commented: "Question maximum effort. Tracings were inconsistent." [Tr. 312]. On the summary of this examination, Dr. Baker circled that Mr. Watts' degree of cooperation was "Fair." [Tr. 308]. Dr. Baker's records list Mr. Watts' height as seventy (70) inches on the test form, but the summary shows a height of sixty-nine and one-half (69-1/2) inches. Table I reflects that the score of 1.55 is not applicable until a person is 70-71 inches tall.

Plaintiff also relies on a diagnosis of COPD on August 4, 2005. [DE 6, p. 3]. On that date, however, Mr. Watts' FEV1 score was 1.80, well in excess of the required score for a person of either 69 or 70 inches in height. Listing 3.02 requires proof by the claimant of COPD "with the FEV1 equal to or less than the values specified in table I corresponding to the person's height without shoes." A diagnosis of COPD alone is not enough to qualify as a disability.

---

[1] FEV1 stands for "Forced Expiratory Volume in the First Second." *Becker v. Commissioner of Social Security*, 2009 WL 483833 at *5, n. 5 (S.D. Ohio 2009). *See also* 20 C.F.R., Pt. 404, Subpt. P, App. 1, 3.00E

Additionally, it is important for a claimant to "follow treatment prescribed by your physician if this treatment can restore your ability to work." 20 C.F.R. § 404.1530(a). The regulations further provide: "If you do not follow the prescribed treatment without a good reason, we will not find you disabled...." *Id.* at (b). Although not in a disability case, the Sixth Circuit in *Riddle v. Southern Farm Bureau Life Ins. Co.*, 421 F.3d 400 (6th Cir. 2005), described the significance of a patient with COPD failing to follow a physician's advice to quit smoking as follows:

> Riddle's abuse of cigarettes was also significant because he suffered from chronic obstructive pulmonary disease (COPD), a condition that, according to the record is "irreversible and usually progressive," making it "important for the patient to quit smoking, otherwise it is very difficult to ever successfully gain control of the disease." However, Riddle indicated on his application for insurance that he was smoking a pack to a pack-and-a-half of cigarettes daily, in spite of Dr. Deshumukh's "long discussion with him" concerning the need to stop smoking.

*Id.* at 415.

In *Fisher v. Astrue*, 2008 WL 4279861 (S.D. Ohio 2008), disability was denied for not meeting the requirements of Listing 3.02, with the ALJ noting the following:

> [T]he record shows the claimant was described as having COPD as a result of on-going cigarette smoking. All treating physicians have suggested that he stop smoking but the claimant has refused to stop smoking. ... The claimant is treated by his family practitioner *but does not take prescribed medicine*.

*Id.* at *9 (emphasis in original). The ALJ "also commented that plaintiff was also asked to cease smoking to promote healing but still smokes.'" *Id.* Similarly, in *Spencer v. Astrue*, 2008 WL 5214230 (W.D. Ky. 2008), the ALJ noted that "the COPD was secondary to claimant's smoking 1-1/2 packs of cigarettes per day, despite having been repeatedly told to quit by her physicians. Pulmonary function tests revealed poor effort on the claimant's part." *Id.* at *3.

In the present case, Mr. Watts was warned many times that he should quit smoking.

| Tr. | Date | Physician | Record Reference to Smoking |
|---|---|---|---|
| 327 | 3/24/05 | Alam | "He is still smoking at least half a pack a day." "Mild acute bronchitis, secondary to persistent tobacco abuse." "Detailed counseling to refrain from smoking." |

11

| 329 | 2/16/05 | Alam | "still smoking at least half pack a day" "Counseled him to refrain from smoking." "Prognosis is poor." |
|---|---|---|---|
| 331 | 12/28/04 | Khater | "He had cigarettes with him at the clinic." "Counseled him about tobacco cessation." |
| 332 | 12/2/04 | Alam | "He is a gentleman who has a H/O severe COPD, chronic bronchitis, CWP who is still smoking at least 4 cigarettes a day...." "Detailed counseling has been done to refrain even from 4 cigarettes of smoking because he is a very high risk for cardiopulmonary morbidity." "Overall prognosis is poor since the Pt. doesn't want to quit smoking." |
| 334 | 11/5/04 | Domingo | "He smokes 1-1/2 PPD for the past 20 years." |
| 335 | 11/2/04 | Alam | "Counsel him to completely refrain from smoking." |
| 336 | 10/20/04 | Garimella | "Smoking cessation again discussed with patient." |
| 338 | 9/23/04 | Garimella | "Again, the Pt. was strongly discussed with about his risk factor modifications especially complete smoking cessation." |
| 340-41 | 8/13/04 | Alam | "Still smokes at least 5 cigarettes a day. Our counseling has helped, ... he has cut down from 2 packs to 5 cigarettes a day. I told him that the best thing he can do is completely quit, and then he will be feeling better, as well as he may have improvement in his overall dyspnea." "Patient with acute bronchitis, because of tobacco abuse." "Continue counseling to quit smoking." |
| 341 | 7/15/04 | Almusaddy | "He still smokes half a pack to a pack a day." |
| 343 | 6/15/04 | Alam | "still smoking six to ten cigarettes a day." "Detailed counseling is also being done to completely refrain from smoking." |
| 345 | 6/10/04 | Alam | "Continue aggressive counseling to refrain from smoking." |
| 346 | 6/2/04 | Alam | "Complete smoking cessation again discussed with the pt." |
| 349 | 5/13/04 | Alam | "He is trying to quit his smoking, only smoking two cigarettes a day." |

| 350 | 4/22/04 | Alam | "Very poor prognosis over all but he continues to smoke at least 10 cigarettes a day. I discussed with hm that he does have CWP but tobacco abuse will damage his heart as well as his lungs. He was advised to quit smoking. It is surprising that patient can buy cigarettes but not willing to buy his medications. Detailed counseling session is done. We also involved his girlfriend who is with him today." |
|---|---|---|---|
| 351 | 3/24/04 | Alam | "He is still smoking at least one pack per day." "I discussed with him in detail that the possibility for his chronic symptoms is because of his continued tobacco abuse, less likely from his coal dust exposure, since he has quit mining, although the FEV1 has been reduced, but if he continues to smoke the changes of him getting better will be very slim." |
| 353 | 2/20/04 | Alam | "Patient was told to be completely off smoking and be compliant with medications." |

The foregoing examples are not the only ones, but are sufficient to demonstrate the substantial evidence supporting the ALJ's finding that Watts "continues to smoke against medical advice." During the August 31, 2005 Hearing, Watts claimed his sister bought his cigarettes and that he only smokes "eight or ten cigarettes a day." [Tr. 550]. He admitted, however, he smoked more than he was told he should. *Id.* He also said he does his own grocery shopping [Tr. 554]. In the December 4, 2006 Hearing, Watts admitted to still smoking half a pack a day and said he got them "off of my friends" and that he rolls his own [Tr. 589].

In *Sias v. Secretary of Health and Human Services*, 861 F.2d 475 (6th Cir. 1988), the claimant had a serious circulatory problem. *Id.* at 476. He claimed he did not wear the support hose his physician prescribed because they cost too much, yet admitted he smoked two packs of cigarettes a day against he advice of his doctor. *Id.* at 480. The court took judicial notice that smoking had been shown to increase the likelihood that one will suffer from circulatory problems. The court said:

> The Social Security Act did not repeal the principle of individual responsibility. Each of us faces myriads of choices in life, and the choices we make, whether we like it or not, have consequences. If the claimant in this case chooses to drive himself to an early grave, that is his privilege – but if he is not truly disabled, he has no right to require those who pay social security taxes to help underwrite the cost of his ride.

*Id.* at 480.

Regarding other treatment, Watts claimed he could not afford to buy any medication and that he treated his COPD with sample inhalers until they ran out [Tr. 552]. The medical records reflect that sample medication for COPD was provided sporadically on the following dates: March 24, 2005; February 16, 2005; August 13, 2004; June 15, 2004; June 10, 2004; May 13, 2004; April 22, 2004; and March 24, 2004 [Tr. 327, 329, 340, 343, 345, 349, 350, 351]. Mr. Watts said in December 2006 that he quit going to the doctor some time ago because he could not pay his medical bills [Tr. 588]. Thus, there is substantial evidence to support the ALJ's finding that there is no evidence of any ongoing treatment or deterioration. Accordingly, the Commissioner's decision will be affirmed with respect to Listing 3.02.

### C   Plaintiff's Claims Regarding the Order of the Appeals Council

Plaintiff finally argues that the ALJ failed to comply with the Appeals Council's Order by not requiring the psychiatrist to complete the Psychiatric Review Technique form ("PRT"), by not adequately addressing Listing 12.05C in combination with severe physical limitations, and by not requiring the Stuart Cooke consultative examination to assess the functional limitations of Watts' medical condition. [DE 6, pp. 9-10]. The Commissioner argues that the absence of the PRT is harmless error in light of the ALJ's findings; that the Appeals Council asked only for evidence regarding Watts' motivation and compliance that could influence psychological testing results, the validity of the results, and clarification of the nature and severity of his impairments, which evidence was provided; and that Dr. Lewis' medical source statement provided the information sought by the Appeals Council.

The PRT is merely a form to document application of the special technique in evaluating the severity of mental impairments. 20 C.F.R. § 404.1520a. The degree of functional limitations must be supported by specific findings as to activities of daily living; social functioning; and concentration, persistence, or pace. 20 C.F.R. § 404.1520a(e)(2). In *Clark v. Sullivan*, 1992 WL 296709 (6th Cir. 1992), the court said: "The failure to complete the Psychiatric Review Technique form, an adjudicatory tool, see 20 C.F.R. § 404.1520a(d) (1992) is not significant." While the form is required under the regulation, it is the findings themselves that are significant. The ALJ detailed these findings in his January 2007 decision.

> Dr. Lynch, consultative psychologist, opined that the claimant's ability to deal with the public, respond to work pressures and respond to changes was moderately impaired, but his ability to understand, remember and carry out instructions was unimpaired. His speech was normal, though process was goal-directed and fund of knowledge was average (Exhibits 3F & 21F).
>
> The claimant has only mild limitations in activities of daily living. He lives alone in a house. He has no problems taking care of his personal needs. He cooks and goes to the store. He walks to places when he does not have a ride. The claimant reports that he drives short distances, 2-3 times a week. He pays bills, counts change and handles a savings account. The claimant has no difficulty taking care of his personal needs. The claimant informs that he does not spend time with others. He allegedly does not leave home to visit friends and relatives and states that he has no social activities, yet he claims he gets his cigarettes off his friends and he has a girlfriend. He has no more than moderate limitations in social functioning. Consultative examiners reported that claimant was distractible and his ability to sustain attention and concentration towards performance of simple tasks was moderately impaired. The Administrative Law Judge finds that claimant has moderate limitations in maintaining concentration, persistence or pace (Exhibits 10E, 20E, 3F & 21F).

[Tr. 32]. The Court also notes that the record contains an earlier PRT with consistent findings [Tr. 259]. It is the opinion of this Court that the absence of a later PRT form is harmless error.

> Regarding Dr. Lewis' report, the Appeals Council required the ALJ to do the following:
>
> Obtain evidence from a medical expert (psychiatrist or psychologist) to comment on the claimant's motivation and compliance or other medical impairments, which could influence the results of psychological testing and to comment on the validity of the test results in evidence, and to clarify the nature and severity of the claimant's impairment (20 CFR 404.1527(f) and 416.927(f) and Social Security Ruling 96-6p).

15

[Tr. 464]. Dr. Lewis addressed the issues adequately [TR. 600-607]. Moreover, Plaintiff's counsel did not ask Dr. Lewis any questions relating to this area.

Plaintiff finally complains that Dr. Stuart Cooke "did not assess the functional limitations of [Watts'] medical condition in accordance with the Appeals Council Order." [DE 6-2, p. 10]. The Appeals Council's Order is dated August 4, 2006 [Tr. 463-5], more than a year after Dr. Cooke's report on June 21, 2005 [Tr. 417-23]. Dr. Cooke said he was unable to "address functional capacity because of the uncertainty of the diagnoses and the conflicting data I am getting." [Tr. 422-23]. Consulting examiner Dr. Lynch provided a medical source statement dated September 26, 2006 [Tr. 521-23]. Accordingly, there was compliance with the Appeals Council order.

### III.   CONCLUSION

The Court, being otherwise fully and sufficiently advised, **HEREBY ORDERS**:

1. Plaintiff's Motion for Summary Judgment [DE 6] is **DENIED.**

2. The Commissioner's Motion for Summary Judgment [DE 7] is **GRANTED** and the decision of the Commissioner **AFFIRMED** pursuant to sentence 4 of 42 U.S.C. § 405(g), as it was supported by substantial evidence and decided by the proper legal standards.

3. Judgment consistent with this Opinion will be entered contemporaneously.

4. **THIS ACTION IS DISMISSED AND SHALL BE STRICKEN FROM THE ACTIVE DOCKET**.

This August 14, 2009.



Signed By:
*Karl S. Forester*   KSF
**United States Senior Judge**